### KEY, ADMX., v. CHARLESTON & W. C. RWY. CO.

#### (142 S. E., 336)

1. RAILROADS—EVIDENCE HELD FOR JURY AS TO RAILROAD'S NEGLIGENCE AS TO ALLEGED LICENSEE, IN FAILURE TO BLOW WHISTLE, HAVE TRAIN UNDER CONTROL, OR USE SUFFICIENT HEADLIGHT.—In action against railroad to recover actual and punitive damages for death of alleged licensee walking along railroad track in intoxicated condition, issue whether railroad was guilty of negligence by virtue of failure of its employees to sound bell or whistle, or by traveling at excessive rate of speed, and failure to have train under control, or by reason of fact that headlight was insufficiently bright, *held* for jury under evidence.

2. RAILROADS—PERSONS IN CHARGE OF TRAIN WERE UNDER DUTY TO STOP TO AVOID INJURING DRUNKEN MAN, IF THEY SAW, OR SHOULD HAVE SEEN, HIM IN TIME.—In action against railroad for death of alleged licensee, railroad employees were under duty to stop train to avoid injuring deceased, even if deceased was walking along track in helpless and drunken condition, provided those in charge of train realized his danger, or could have noticed it, by exercise of reasonable diligence, and had ability to stop the train.

3. RAILROADS—QUESTION WHETHER ENGINEER AND FIREMAN SAW, OR COULD HAVE SEEN, ALLEGED LICENSEE IN TIME TO AVOID INJURY, HELD FOR JURY.—In action against railroad for actual and puni-

tive damages for death of person claimed to have been walking along track in intoxicated condition as licensee, question whether engineer and fireman saw, or could have seen, deceased's position of danger in time to stop train and avoid injury, *held* for jury under evidence.

4.  Railroads—Withdrawal from Jury of Railroad's Willfulness as to Alleged Licensee Held Error Under Evidence, Notwithstanding Jury Returned Verdict for Defendant on Issue of Negligence.—In action against railroad for death of drunken man, claimed to have been proceeding along track as licensee, in which plaintiff sought recovery of actual and punitive damages, action of Court in withdrawing from jury question of railroad's willfulness, after having submitted question of negligence, *held* error, notwithstanding jury's verdict for defendant, since contributory negligence would not be defense to willful injury.

5.  Railroads—Contributory Negligence is No Defense, Where Railroad is Guilty of Willfulness.—Where only issue before jury in action against railroad for death on railroad's right of way is defendant's negligence, contributory negligence is complete defense, whereas deceased's ordinary contributory negligence would not be a defense in case defendant is found to have acted willfully.

6.  New Trial—Erroneous Refusal to Submit Willfulness, as Well as Negligence, in Action Against Railroad for Death, Required New Trial on All Issues.—In action against railroad for actual and punitive damages for death, in which Court correctly submitted issue of negligence, but erroneously refused to submit issue of defendant's willfulness, plaintiff was entitled to a new trial on all the issues, and not merely on the issue of willfulness, railroad being liable in a proper case for punitive damages.

7.  Railroads—Evidence Showing Equal Probability That Deceased Was Killed by Another Train Than That Referred to in Complaint Prevented Recovery Against Railroad.—Where, in action against railroad for death, complaint alleged that defendant was negligent in running of a certain train, plaintiff was not entitled to recover if evidence showed equal probability that deceased was killed by some train other than that referred to in the complaint, since plaintiff was bound by complaint.

Before Wilson, J., Aiken, March, 1926.  Reversed and remanded for new trial.

Action by Mrs. Della Key, as administratrix of the estate of Eugene Boyd, deceased, against the Charleston & Western Carolina Railway Company.  Judgment for defendant, and plaintiff appeals.

*Messrs. Williams, Croft & Busbee,* for appellant, cite: *Duty of railroad to trespassers:* 57 S. C., 243; 64 S. C., 8. *Question of negligence for jury:* 68 S. C., 488; 82 S. C., 327; 85 S. C., 25; 90 S. C., 262. *Contributory negligence no defense against willfulness and wantonness:* 93 S. C., 25. *Defendant liable for delicts of lessee:* Sec. 4764, Code; 79 S. C., 275. *Burden of proof of contributory negligence:* 132 S. E., 824. *Charge on facts:* 117 S. E., 513; 144 U. S., 408; A. & E. Enc. L., 465; 55 S. C., 179; 66 S. C., 482; 76 S. C., 49.

*Messrs. F. B. Grier, M. G. McDonald,* and *Gunter & Wilder,* for respondent, cite: *Scope of signal statute:* 100 S. C., 181. *Evidence of willfulness cannot be admitted because of "dim" headlight:* 72 S. C., 411; 76 S. C., 207; 70 S. C., 148; 76 S. E., 1; 84 S. C., 67. *Degree of care required of drunken person:* 20 R. C. L., 128; 22 R. C. L., 976; 66 S. C., 246; 36 A. L. R., 334; 164 Ill. App., 270; 219 Ill. App., 606; 32 La. Ann., 615; 96 Md., 67; 39 Mich., 537; 26 Minn., 357; 175 Mo. App., 111; 60 Mont., 193; 81 A. S. R., 498; 121 N. Y. S., 706; 136 N. C., 385; 11 Ohio App., 424; 43 Tex. Civ. App., 48; 18 L. R. A., 519; 36 A. L. R., 336. *Charge on facts:* 66 S. C., 246; 48 S. E., 793. *If a person is warned of a danger and nevertheless risks an injury therefrom, he is barred from recovery:* 20 R. C. L., 120; 29 Cyc., 525; 12 A. S. R., 626. *Verdict cannot be based upon a mere conjecture:* 296 Fed., 202; 263 Pa., 398; 31 N. E., 220; 2 L. R. A. (N. S.), 905; 72 Pa. Rep., 1038; 5 A. & E. Ann. Cas., 167; 70 L. Ed., 629; 9 Fed. (2d), 185; 2 Fed. (2d), 913; 6 Thomp. on Neg., Par. 7395; 10 R. C. L., 870.

March 31, 1928.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

This action was brought in the Court of Common Pleas for Aiken County to recover actual and punitive damages

for the alleged negligent and reckless killing of Eugene Boyd by the defendant. The trial was before Hon. John S. Wilson, Circuit Judge, and a jury. There was a directed verdict for the defendant as to punitive damages. The jury found in favor of the defendant as to actual damages. The plaintiff has appealed to this Court. The defendant asks that the verdict and the judgment below be sustained on the ground that the presiding Judge should have also directed a verdict for the defendant as to actual damages.

In disposing of the question as to the alleged error in refusing to submit the issue of willfulness, we may, at the same time, consider the defendant's appeal.

To measure the evidence properly, we must first see what acts of negligence and willfulness were charged against the defendant. These were stated in the complaint to be: The failure to give proper signals or warning of the train's approach; the rapid and dangerous rate of speed at which the train was running; failure to keep a reasonable lookout; failure to have train under proper control, so as to be able to stop the same; and failure to have proper headlight on the locomotive, the one in use not casting light far enough ahead to enable the proper seeing of a person on the track.

Bearing upon the acts of negligence set out, and connected therewith, were allegations in the complaint that the place of the accident had been used by the public as a footpath, walkway, and traveled place, openly and notoriously, for more than 20 years, and that the intestate was in a helpless condition on the railroad's right of way at the time the accident occurred.

The defendant, after setting up a general denial, alleged that the deceased was a trespasser, and that his death was occasioned by his contributory negligence and willfulness, in that he placed himself in a position of danger on defendant's right of way, while in an intoxicated condition, and failed to use due care, or even slight care, for his own safety.

It is necessary, because of opposing views, to review the testimony, to some extent, for the purpose of seeing if there was *any evidence* to sustain the allegations of the complaint.

There was *some testimony,* and so much seems to be admitted in the opinion of Mr. Justice Cothran, showing that the deceased was a licensee, and that his dead body, badly mangled, was found in the footpath, near the ends of the cross-ties, in a place that the public had used uninterruptedly and continuously for at least 20 years; that deceased was struck and killed by some part of a train while sitting on the end of a cross-tie, or standing upon or quite near to the railroad track; that the railroad track was perfectly straight for a great distance; that persons upon an engine, approaching the place where the deceased was killed, by the use of ordinary care, could have seen for a considerable distance an object on the track as large as a man; and that, shortly after the deceased had left Ellenton for his home at Bush Station, walking along the railroad track in an intoxicated condition, a train of the defendant passed through Ellenton, traveling also in the direction of Bush.

The record discloses *some testimony* that no signals were given for at least three crossings between Ellenton and the place where the body of the deceased was found. It is true, as stated by Mr. Justice Cothran, that nearly all of the plaintiff's witnesses, in their testimony, limited the signal referred to by them as the one of sounding the whistle. But one witness, Angus Williams, testified positively:

"I didn't hear it blow at all as it was going out of Ellenton in the direction of Mr. Boyd. I did not hear *any signals* at all after it left Ellenton."

If the witness had in mind, as he may have had, both the blowing of the whistle and the ringing of the bell, warning signals usually given by a locomotive engine, when he used "any signals," then he meant to say, and did say, that the bell was not rung. This view seems strengthened by

the fact that, before using the language referred to, the witness had first testified that *he did not hear the whistle blow.* In any event, if there was doubt as to the meaning of the language of the witness, and more than one inference could have been drawn from his statement, and if either of such inferences were favorable to the plaintiff, the jury was the proper authority to pass upon what that inference was. And, even if it should be conceded that a bell of some kind did ring, it was for the jury to determine if the defendant, under all the circumstances, should have also sounded the whistle, since a whistle is generally more likely to give warning than a bell.

One witness testified that the train was making about 25 miles per hour; another stated it was running "pretty lively"; and the engineer and fireman testified that the speed was from 20 to 25 miles per hour. The engineer swore that he could stop his train at the rate he was running within 25 feet. Whatever the speed, 25 miles per hour, more or less, it was for the jury to say if it was excessive, and if the train was under proper control at the time, under the circumstances; 50 miles an hour may not be an excessive rate of speed at a given time, under certain circumstances, while 10 miles an hour might be excessive at another time, under other circumstances. *So the questions of negligence as to the rate of speed and as to having the train under control were for the jury.*

The engineer swore that the engine was equipped with a standard electric headlight, and was burning brightly, and that, going through the cut where the accident happened, he could distinguish a man standing up for 450 feet. Witnesses for the plaintiff, even if their testimony may be "unsatisfactory" to many people, swore that the headlight was dim; and one of plaintiff's witnesses testified that he had ascertained by experience that with the use of a proper headlight he "could see a man anywhere in that cut, which was a distance of one-third of a mile (1,760 feet)." *If the headlight was not*

*bright, but was only dim, it was for the jury to say if the dim light was sufficient, or if it was negligence to carry a light of that kind.*

We find in the record all of the testimony referred to by Mr. Justice Cothran to show that the deceased was under the influence of whisky a short while prior to his death. But there was evidence that he was not helplessly drunk at that time, and that he could walk, and was walking along or on the railroad track just before the train came along. But, even if the deceased was down on the track, helplessly drunk, and if those in charge of the operation of the train saw him in that condition, and appreciated his plight, or they could have seen him and appreciated his condition, by the exercise of reasonable diligence, and had the ability to stop the train without injuring the deceased, it was their duty, under the law, to so do. *These questions, on the matter of contributory negligence, were all for the jury.*

The very positive testimony of the engineer and fireman that they did not see the deceased on the track was testimony for the jury to consider. They had the right to accept it in the face of any contrary evidence, direct or circumstantial. But the testimony of these witnesses should not have been accepted by the Court as conclusive of the issues involved *as a matter of law.* In his concurring opinion in *Wilson v. Southern Ry. Co.,* 93 S. C., 17; 75 S. E., 1014, Mr. Justice Woods said:

"But contributory negligence is not a defense against willfulness or wantonness. The duty of a locomotive engineer and a fireman to keep a vigilant lookout ahead, for the sake of passengers as well as those who may be helpless on the track, is urgent, and the failure to keep a lookout may be evidence of recklessness or wantonness. In this case, the night of the fatality was bright and the locomotive had a powerful electric headlight. *There was evidence from which it might be inferred that Wilson was lying on the*

*track asleep or drunk or that he was crossing the track on his way home and that the place was one where persons were to be expected crossing the track. The evidence also tended to show that those in charge of the engine did not see Wilson at all, for the train did not slow up or stop. From all this the jury might infer that no lookout was kept and that this was a reckless disregard of the lives of those who might be on the track even as trespassers. Sentell v. So. Ry., 70 S. C., 183 [49 S. E., 215].* The evidence warrants, also, a rejection of such on inference, but whether the inference should be accepted or rejected is a question for the jury." (Italics added.)

Two cases are rarely exactly alike. There was much similarity, however, in the facts from the plaintiff's viewpoint in the case at bar and the facts favorable to the plaintiff in the case of *Woodward v. Southern Ry.,* 90 S. C., 262; 73 S. E., 79. The main difference, as pointed out by Mr. Justice Cothran, in the facts of the *Woodward case* and this case was that in the former there was some testimony that there was *no headlight* on the engine; while here the testimony most favorable to the plaintiff was that the headlight was *dim and insufficient.* A dim light, of course, may be much better than no light at all; still, it may be negligence under some circumstances for a locomotive engine to be operated with only a dim headlight. Certainly, this Court cannot say that a *dim headlight* is sufficient to comply at all times with the law. To do so might lead to the erroneous conclusion that it would be all right for a locomotive to be operated at night with a tallow candle. We prefer for juries to say whether dim lights or tallow candles are sufficient. In the *Woodward case* Mr. Chief Justice Jones, speaking for the Court, used this language:

"We think the Court was clearly in error in basing the nonsuit on the ground that the evidence showed conclusively that deceased caused his own death by being drunk and asleep on the track.

"It was much debated in argument whether the testimony showed that the deceased was a trespasser or a licensee. Let us waive that question and for the purpose of this appeal assume that deceased was a trespasser. The rule of law generally applicable in such case is that the railroad company owes to a trespasser on its track the duty of so operating its trains as not to injure him wantonly or by such gross negligence as indicates a reckless disregard of human life. *Smalley v. Railroad Co.,* 57 S. C., 243; 35 S. E., 489; *Haltiwanger v. Railroad Co.,* 64 S. C., 8; 41 S. E., 810.

"We think the testimony was sufficient to carry the case to the jury on the question of recklessness. The speed of the train on a dark night running without headlight and without regarding the statutory signals, through a thickly settled community, with the knowledge that many people were accustomed day or night to use the track as a walkway, would seem to warrant submission to the jury to determine whether the conduct of defendant's employees was merely inadvertent, or was in reckless disregard of human life. *McKeown v. Railroad Co.,* 68 S. C., 488; 47 S. E., 713. The failure to give the statutory signals is competent testimony on the question of recklessness. *Goodwin v. Railroad Co.,* 82 S. C., 327; 64 S. E., 242; *Rowe v. Railroad,* 85 S. C., 25; 66 S. E., 1056."

Without going into them, we point to the following cases, which support in the main the principles announced in the *Wilson* and *Woodward cases: Tyler v. Atlantic Coast Line R. R. Co.,* 104 S. C., 107; 88 S. E., 541; *Sanders v. So. Ry. Co.,* 90 S. C., 331; 73 S. E., 356; *Goodwin v. Atlantic Coast Line R. R. Co.,* 82 S. C., 321; 64 S. E., 242; *Richardson v. Atlantic Coast Line R. R. Co.,* 111 S. C., 359; 98 S. E., 132; *McKeown v. South Carolina & Georgia Extension R. R. Co.,* 68 S. C., 483; 47 S. E., 713; *Jones v. Charleston & Western Carolina Ry. Co.,* 65 S. C., 410; 43 S. E., 884; and *Mason v. Southern Ry. Co.,* 58 S. C.,

70; 38 S. E., 440; 53 L. R. A., 913; 79 Am. St. Rep., 826.

The case of *Sharpe v. Southern Ry. Co.,* 125 S. C., 478; 119 S. E., 245, referred to by Mr. Justice Cothran, in our opinion, is not authority for the view he takes, but it is in line with our conclusion. There the trial Judge (Hon. Ernest Moore) only submitted the question of negligence to the jury, declining to submit the issue of willfulness. The verdict for the plaintiff for actual damages was approved by this Court. The plaintiff was evidently satisfied with the amount of the verdict, and did not appeal as to the matter of punitive damages. So this Court did not pass upon that issue. The dissenting opinion of Mr. Justice Marion, which was concurred in by Mr. Justice Cothran, "is very interesting and forcible," as are all the opinions of that able jurist. But, unfortunately for the position of Mr. Justice Cothran in this case, the positions of Mr. Justice Marion were not sustained in the *Sharpe case* by a majority of the Court; and consequently they cannot be accepted by us, at this time, as authority.

Of course, this Court has great respect for any ruling made by Hon. E. C. Dennis, Circuit Judge, just as we regard highly the rulings of the distinguished Circuit Judge who heard this case, Hon. John S. Wilson. It is not proper, however, for us to be guided by any action Judge Dennis may have taken in the first trial of the case at bar in refusing to submit to the jury the issue of punitive damages, since the evidence in the trial before him has not been furnished the Court, and we are unable to say if the evidence in that trial was the same as that on the last trial.

We wish it expressly understood that we do not intend by anything already said, or which may hereafter be said, to indicate our view as to what the result of the trial in the lower Court should have been, or should be hereafter—to the contrary we do not express, and have no view, as to the result. We have not intended to make any argument in favor of the plaintiff, nor to

refute any argument made for the defendant. We have felt forced to call attention to testimony, *which may have been* considered favorable to the plaintiff's cause of action, because of the very strong statement that *all* the evidence was favorable to the defenses of the defendant. We simply believe that both the issues of negligence and willfulness should have been submitted to the jury. In our opinion, the Circuit Judge ruled correctly in allowing the jury to pass upon the question of negligence; and that he committed error in not submitting the question of willfulness.

The position that all the appellant can now ask is a trial on the issue of willfulness—and that she cannot be granted a new trial generally—does not seem tenable to the Court. When the only issue before the jury was the negligence of the defendant, and when any willfulness on its part could not be considered, the willful contributory negligence of the deceased, or his ordinary contributory negligence, if established, was a complete defense to the defendant. If the jury could have decided that the defendant was willful, even the ordinary contributory negligence of the deceased, though completely shown, was not a defense. The case of *Massey v. Hines, Director General of Railroads,* 117 S. C., 1; 108 S. E., 181, is not in point. There the verdicts, separated, were for both actual and punitive damages. The defendant, representative of the United States Government, was not liable, under the law, for punitive damages, and the Court reversed the judgment for such damages, letting the verdict for actual damages stand. The Federal Government is not involved in the case at bar. The defendant is liable under the law, in a proper case, for punitive damages.

The second exception of the appellant imputes error to the trial Judge because he charged that the plaintiff could not recover if the evidence showed that it was just as probable that the deceased was killed by some train other than the train referred to in the complaint of the

plaintiff.  It is urged that the defendant was liable whether the deceased was killed by one of its trains or the train of its lessee, Atlantic Coast Line Railroad Company, and that the plaintiff, in her proof, was not confined to any one particular train.  We think this exception is without merit, for the reason that the complaint of the plaintiff charged negligence on the part of the defendant's servants in the running of a certain train, referred to in the complaint.  The plaintiff is bound by her complaint, and the Circuit Judge was correct in the instructions he gave.  See *Geddings v. A. C. L. R. R. Co.,* 91 S. C., 477; 75 S. E., 284.

We do not think it necessary to review the other exceptions of the appellant.

The judgment of this Court is that the judgment below be, and the same is hereby, reversed, and the cause remanded for a new trial.

MR. CHIEF JUSTICE WATTS and MR. JUSTICE STABLER concur.

MR. ACTING ASSOCIATE JUSTICE R. O. PURDY concurs in result.

MR. JUSTICE COTHRAN (dissenting) : I respectfully dissent from the conclusions announced in the opinion of Mr. Justice Blease, for the reasons which follow :

The circumstances attending the death of the deceased, Eugene Boyd, taken largely from the argument of counsel for the appellant, were these:

"On the night of February 2, 1924, Mr. Eugene Boyd was at the store of Mr. M. F. Bush in Ellenton. *He was drunk, and was sitting beside the stove drowsing,* until Mr. Bush closed up his store around 10 o'clock."

Mr. Bush, a witness for the plaintiff, testified:

"I saw him the night before he was killed, in my store in Ellenton at 10 o'clock.  He was pretty full of whiskey. * * * He came in about 9 :30, and it was cold, and he went to sleep and kept me up, and slept until close around

10 o'clock. I suggested or told him that he better not go home that night, but to stay with Mr. Dixon who worked for me and lived in the yard, but he said the old woman was expecting him, and he went down the street towards the railroad. * * * My store is near the depot, and Boyd was there two or more times that night. He was pretty drunk the last time, and went to sleep by the fire. It was a cold night. I tried to keep him from going home."

Mr. Buckingham, also a witness for the plaintiff, testified:

"I saw him the afternoon before he was killed. I think he was drunk."

Dr. Brinkley, also a witness for the plaintiff, testified:

"I saw Boyd that afternoon. He was pretty full. * * * He had the reputation of drinking heavily."

James Cohen, also a witness for the plaintiff, testified:

"Mr. Boyd was pretty full of whiskey that night. * * * Mr. Boyd and I walked together pretty well, locking arms. He was not walking good, but as they walk when they are full. * * * I went with Boyd as far as Cassell's Mill, and told him to go the dirt road and not to go on the railroad."

This was the condition of the deceased when he started home down the railroad track, about 10 o'clock at night, in cold February weather, according to the testimony of the witnesses for the plaintiff and the admission of his own counsel. His condition was such that the witness, Bush, advised him to spend the night at Ellenton, and the witness, Cohen, who walked arm in arm with him, supporting him, advised that he leave the railroad and use the dirt road parallel.

The evidence for the plaintiff tends to show that the deceased reached the track from Bush's store and proceeded down towards his home near Bush Station, some three miles toward Augusta, walking in a path along the left side

of the railroad; that within a short time a freight train passed Ellenton without stopping, and entered a cut about a mile from Ellenton station; that it was running "pretty lively"; that the headlight was "kind of dim"; that the whistle was not blown for the crossing between the station of Ellenton and the cut; that the train did not stop until it reached Augusta.

At about 8:30 or 9 o'clock on Sunday morning February 3, 1924, Boyd's dead body was found near the ends of the cross-ties, some four to six feet away, in the cut just beyond the one-mile post from Ellenton. His back was broken in two places, his neck was broken, and there were bruises on the left side of his head; his body was stiff and cold, indicating that he had died some time during the night or the early morning. Near the point where the body was found there were small tracks between the cross-ties, with the toes pointing out from the railroad; they "appeared to have been made by Boyd while sitting on the end of a cross-tie."

The main question in the appeal is whether the presiding Judge committed error in withdrawing from the jury a consideration of the questions of willfulness and punitive damages.

Assuming that there was evidence for the plaintiff tending to show that the public had been using the footpath along the ends of the cross-ties of the railroad continuously, uninterruptedly, and without objection from the railroad company for at least 20 years, that the deceased was struck and killed by some part of a train while sitting on the end of a cross-tie of the railroad track, with his feet resting in or near the traveled footpath, that the railroad track was perfectly straight for a great distance, that persons upon the engine approaching the place where the deceased was sitting could, by the exercise of ordinary care, have seen an object on the track as large as a man for the dis-

tance between the station and the point where the deceased was sitting, that there were four public crossings between those points, and that no signals, statutory or otherwise, were given; that no effort was made to slacken the speed of the train; that the headlight was dim.

Upon practically these identical facts, the Circuit Judge (Hon. Ernest Moore) withdrew the questions of willfulness and punitive damages from the jury, in the case of *Sharpe v. Railroad Co.,* 125 S. C., 478; 119 S. E., 245, to which ruling there was no exception by the plaintiff; and, the case at bar having been tried first before his Honor, Judge Dennis, and later before his Honor, Judge Wilson, both Circuit Judges made the same ruling that there was not sufficient evidence of willfulness to warrant a submission of the matter of punitive damages to the jury.

The evidence of the defendant's *negligence* in the operation of the train is exceedingly unsatisfactory; much more so of its willfulness.

There is absolutely no credible testimony as to the failure to give signals, even if it be held that Boyd was entitled to the protection of the statute. The nearest crossing toward Ellenton from where the body was found is about a half a mile, according to plaintiff's witness. The witness, Wheeler, who lived some distance from this crossing, testified that he was in his house when the 10 p. m. train passed, and did not hear the whistle blow. The night was cold, and he was in his house, and was paying no particular attention to the train. Nowhere does he testify that he did not hear the bell ringing. A Negro, Angus Williams, testified that the train passed him near Ellenton, and he did not hear the whistle blow. His testimony further shows that he had passed Boyd before then, walking in the opposite direction down the track, and that he and Boyd were a mile apart when the train passed. Nowhere does he say that the bell was not ringing. The only other

signal witness was a Negro named Cohen, who was at his home about half a mile on the opposite side of Ellenton from Boyd when the train passed, and who says he did not hear the train blow as it left Ellenton. Nowhere does he testify that the bell was not ringing. On the contrary, the positive evidence shows that the bell was cut on before reaching Ellenton, and continued to ring until it entered the cut. This constitutes all of the evidence as to the failure to give the signals, and it will be noted that not one of the witnesses testified that the bell was not ringing, which would be a sufficient compliance with the statute.

There is an entire lack of testimony tending to show any failure of the engineer or fireman on the train in question to keep a lookout. On the contrary, the positive evidence of both of these witnesses is to the effect that they were keeping a lookout ahead, and saw nothing on the track. The physical facts corroborate this testimony. The engine was inspected at the end of its run, and no evidence was found of having struck any one. In addition to that, there were six or seven other trains that passed during the night, any one of which, if Boyd was struck by a train, may have hit him. Above all that, the undisputed testimony shows that at the point in question the track is slightly down grade, and it is not necessary for the engine to be working steam or for the fireman to shovel coal. There was a trestle just below the west end of the cut that was under repairs, and that had been "bulletined," so that the engineer was naturally looking out for that.

The only testimony at all as to the speed of the train is on the part of the Negro, Williams, who said the train "slowed down" for Ellenton and "picked up pretty lively" after leaving there. There is not the slightest evidence that the train was running faster than usual, or that the speed was excessive. On the contrary, the positive testimony of both the engineer and the fireman is to the effect that there was a trestle under repair at the west end of the

cut where the body was found, and that the orders were not to exceed 10 miles per hour in crossing it, and that, as a consequence, the speed before entering the cut was not more than 20 miles per hour, which was under schedule.

The only other testimony relied upon to show willfulness is that of the same two Negroes, Williams and Cohen, with reference to the headlight on the engine. Williams testified that it had "a kind of dim headlight" when it passed him at Ellenton, an expression that really means little, if anything. He then proceeds to nullify the effect of this testimony by stating that, when the light looked dim, he was standing at the crossing at the east end of the cut, and "I first saw the light of the train coming from towards Robins. This was before it blew for Ellenton, and the signal post was about a mile away. When I saw it, the light looked dim." Thus it appears that his observation with reference to the headlight was made from a point more than two miles distant. Cohen testified that the headlight looked dim from his house, some distance away, but admitted that he did not see the train until it got opposite his house, thus affording only a side view. "I can't hardly get at how the light looked whether white, red, or how," he said. Both witnesses merely used a relative term to describe the condition of the headlight. On the contrary, the record shows positive evidence of the fact that the engine was equipped with a standard electric headlight, which was burning brightly at the time.

The only cases cited by appellant in which a headlight is referred to are those of *McKeown v. Railroad*, 68 S. C., 488; 47 S. E., 713; and *Woodward v. Railway*, 90 S. C., 262; 73 S. E., 79. In those cases the evidence was that the train was running without *any headlight* at all, which is quite a different proposition from running with a headlight characterized as "dim."

But, assuming that there was sufficient evidence of willfulness on the part of the railroad company to warrant a

submission of that issue to the jury, the evidence is overwhelming that the deceased was himself guilty of such gross contributory negligence as amounted to recklessness, which would bar a recovery, even if willfulness or recklessness by the railroad company be made to appear. *Spillers v. Griffin,* 109 S. C., 78; 95 S. E., 133; L. R. A., 1918-D, 1193.

The deceased is shown by the plaintiff's own witnesses to have been a hard drinker; as is often the case, a hard worker during the week and a hard drinker after work hours on Saturday evenings. He appeared at Bush's store about 8:30 or 9 o'clock that Saturday night, drunk. He sat by the stove, and went to sleep. At 10 o'clock the storekeeper, who had been "kept up" by the drunk man, wanted to close his store, and waked up the deceased. He saw his condition, and advised him not to attempt to go home, but to spend the night with an employee of his. He declined, staggered out of the store to the nearby railroad track, and started homeward. He met a friend, who, arm in arm, helped the staggering drunken man a part of the way home, and advised him to leave the railroad and use the paralleled highway. This he also declined. The next heard from him was his dead body lying near the track with every evidence, as the appellant's argument concedes, of having been struck by a train as he was sitting asleep on the end of a cross-tie. If these facts do not present a case of gross, inexcusable negligence, amounting to recklessness, it is difficult to conceive of facts that would. See the very interesting and forcible opinion of Mr. Justice Marion, dissenting in the case of *Sharpe v. Railroad Co.,* 125 S. C., 478; 119 S. E., 245, where the ordinary negligence of the person injured was considered.

There are two phases of the law that have attracted my attention in the investigation of this case, which are interesting and deserve attention:

(1) It is held in a number of cases, cited in a note to 21 L. R. A. (N. S.), 427, that willfulness cannot be imputed to a railroad company against a licensee upon its tracks until he shall have been discovered in a position of peril. I do not think that our cases sustain that proposition. If the railroad company owes a duty to keep a lookout for licensees, it may be charged with recklessness or willfulness in not performing that duty, even before the party in peril may have been discovered.

(2) It has also been held by a number of cases that, where the jury has rendered a verdict in favor of the railroad company upon the issue of negligence, the charge of willfulness having been eliminated by the presiding Judge, the elimination is harmless error. *Olson v. Moorhead,* 142 Minn., 267; 171 N. W., 923. *McNeil v. Munson,* 8 Ala. App., 610; 62 So., 459 (which, however, was reversed in 184 Ala., 420; 63 So., 992). *McColman v. R. Co.,* 150 N. C., 707; 64 S. E., 781. *Erwin v. R. Co.,* 200 Ala., 557; 76 So., 915.

I do not think that position can be sustained. The elimination of the cause of action based upon willfulness permits the defendant to resist the attack of the plaintiff upon the ground of ordinary contributory negligence; a defense which would not be available, if the tort was willfully committed.

The most that could possibly be decided in favor of the appellant is that the verdict in favor of the railroad company for actual damages, based upon ordinary negligence, should stand, and that the new trial should be had only upon the issue of punitive damages, based upon the allegation of willfulness.

In the case of *Massey v. Hines,* 117 S. C., 1; 108 S. E., 181, the plaintiff had a verdict of $12,000.00, punitive and $8,000.00, actual damages. The defendant, Director General of Railroads, appealed from that part of the verdict which awarded punitive damages; he did not appeal from

the other part of the verdict. The Court set aside the verdict carrying punitive damages upon the ground that such damages could not be recovered from an agency of the government, and directed that the verdict for actual damages be allowed to stand.

I think that his Honor, Judge Wilson, was entirely right in his direction of the element of willfulness, and that, as no valid objection to the verdict upon the cause of action based upon negligence has been shown, the judgment should be affirmed.